## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CHARLINE DE LA CRUZ,** | : | **Civil No.  1:22-CV-1049** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CAROLYN COLVIN,[1]** | : | **(Magistrate Judge Carlson)** |
| **Acting Commissioner of Social Security,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

### I.    Introduction

Charline De La Cruz is now twenty four years old and has been engaged in Social Security litigation for the past eleven years, as she has pursued both minor and adult disability claims. Over the course of this protracted litigation, it has become apparent that De La Cruz has faced a host of emotional challenges at a young age. These challenges included ADHD, an affective disorder, depression, anxiety disorder, bipolar disorder, and intermittent explosive disorder. De La Cruz has confronted these challenges in a tempestuous social setting marked by instances of familial violence, conflict and strife, as well as episodes in which family members

---

[1]Carolyn Colvin is currently serving as the Acting Commissioner of Social Security. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Carolyn Colvin is substituted as the defendant in this suit.

have either failed to ensure needed medication compliance or have engaged in conduct which has complicated and exacerbated the severity of her symptoms. The constellation of these challenges has been daunting, and De La Cruz's circumstances evoke great sympathy. Nonetheless the evidence also indicates that De La Cruz has been able to obtain and sustain employment while caring for a minor child.

It is against the backdrop of this complex personal and social dynamic that we consider De La Cruz's latest appeal. This is now De La Cruz's third Social Security appeal of an adverse Administrative Law Judge (ALJ) decision denying her application for benefits. In De La Cruz's two prior appeals, the district court, Nealon, J. and Schwab, M.J., found there was a need for further articulation of the grounds for the administrative denial decisions and remanded the case for further consideration of the evidence relating to De La Cruz's claim of juvenile and adult disability.

This past now serves as prologue for our evaluation of the instant ALJ decision, which is the subject of De La Cruz's third appeal. That 28-page decision, once again, reviewed the evidence relating to De La Cruz's emotional impairments, judging that evidence against the exacting standards for juvenile and adult disability determinations, and found that De La Cruz was not disabled.

2

In undertaking this review, we recognize a legal truth: the Supreme Court has underscored for us the limited scope of our substantive review when considering Social Security appeals, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

Beyond this legal truism, we also recognize an immutable fact: By dint of effort, it appears that De La Cruz has succeeded in the face of enormous challenges to demonstrate an ability to perform sustained work. In fact, she has worked in the fast-food industry and has been promoted in her job.

Presented with this protracted, complex and equivocal record, following a thorough analysis of the often ambiguous evidence the ALJ who has most recently

3

considered this case concluded that De La Cruz had not met the exacting standards for childhood or adult disability and denied this claim. De La Cruz now challenges this decision arguing that it failed to comply with prior remand orders; neglected to find that De La Cruz met listing requirements; erred in the assessment of the medical evidence and the evaluation of the claimant's credibility; and rested upon a flawed hypothetical question. However, while the challenges in De La Cruz's life evoke our profound empathy, after a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner denying this claim.

## II.     **Statement of Facts and of the Case**

### A. **Introduction**

Charline De La Cruz's legal journey through the Social Security system began on March 6, 2013, when her mother submitted a childhood disability benefit application on her behalf alleging an onset of disability on January 1, 2011. (Tr. 16). De La Cruz was born on May 24, 2000. (Tr. 19). Thus, she was twelve years old when this administrative process began and is now twenty four years old.

According to De La Cruz's initial disability application her disabling impairments were emotional and consisted of ADHD and an affective disorder. (Tr. 19). While the fundamental nature of her impairments has remained largely unchanged over the past decade and has focused upon psychological impairments, over the protracted history of this litigation the nature of these claims changed. As De La Cruz reached adulthood her application included both childhood disability claims and an adult disability claim.

Further, with the passage of time one other immutable fact changed the nature of this Social Security disability analysis. Over the course of this extended litigation, De La Cruz obtained and maintained employment, a fact which directly relates to one of the core issues in this case: The question of whether she can perform substantial gainful activity.

## B. De La Cruz's Clinical History

While De La Cruz's childhood disability application alleged an onset of disability in 2011, the root causes of her emotional impairments appear to have been recognized as early as 2008 when the plaintiff lived in New York. In September of 2008, De La Cruz, who was then an elementary school student, was admitted into the School Site Program in the Bronx after it was reported that she experienced moodiness, difficulty expressing her feelings, poor academic performance, and

challenging behavior toward her family. (Tr. 137). De La Cruz participated in this program until June of 2012, when she and her family moved to Pennsylvania. (Tr. 135-208).

The clinical records of this initial medical intervention are somewhat fragmentary[2] and consist largely of treatment notes from 2012. (Id.) However, at the time that De La Cruz began the School Site program in September of 2008, her global assessment of functioning or GAF score was rated at 50 to 55. (Tr. 143, 154). When she was discharged from the program in June of 2012, her GAF score was assessed at 60. (Tr. 139).

These were significant clinical assessments and were emblematic of emotional impairments which were not wholly disabling since a GAF score, or a Global Assessment Functioning scale, was a psychometric tool which took into consideration psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision*, 34, Washington, DC, American

---

[2] We note that the age of this case, combined with the fragmentary nature of many medical records, presented unique challenges for the ALJ who adjudicated this latest appeal. That ALJ was called upon to address two prior remand order from the Court which directed the ALJ to engage in more detailed analyses of various medical issues, analyses that were highly challenging given the paucity of proof in the record which spoke to the issues raised by the Court in its prior remand decisions.

Psychiatric Association, 2000. ("DSM-IV-TR"). In this regard, GAF scores "in the range of 61–70 indicate 'some mild symptoms [of depression] or some difficulty in social, occupational, or school functioning.' Diagnostic and Statistical Manual of Mental Disorders ('DSM IV') 34 (American Psychiatric Assoc. 2000). GAF scores in the 51–60 range indicate moderate impairment in social or occupational functioning." Cherry v. Barnhart, 29 Fed.Appx. 898, 900 (3d Cir. 2002). DaVinci v. Astrue, 1:11-CV-1470, 2012 WL 6137324 (M.D. Pa. Sept. 21, 2012) report and recommendation adopted, Davinci v. Astrue, 1:11-CV-1470, 2012 WL 6136846 (M.D. Pa. Dec. 11, 2012). "A GAF score of 41–50 indicates 'serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).' DSM–IV at 34. A score of 50 is on the borderline between serious and moderate symptoms." Colon v. Barnhart, 424 F. Supp. 2d 805, 809 (E.D. Pa. 2006). See Shufelt v. Colvin, No. 1:15-CV-1026, 2016 WL 8613936, at *2 (M.D. Pa. Sept. 15, 2016), report and recommendation adopted sub nom. Shulfelt v. Colvin, No. 1:15-CV-1026, 2017 WL 1162767 (M.D. Pa. Mar. 29, 2017).

The existing treatment notes from the School Site program in 2012 indicate that De La Cruz's impairments were not wholly disabling. Furthermore, those clinical records note that De La Cruz's condition improved when she was compliant

with her medication but revealed episodes of non-compliance. As to these episodes, the existing records suggest that there were several root causes for De La Cruz's failure to consistent adhere to her medication regime. In part, this failure could be attributed to De La Cruz, who occasionally displayed indifference to treatment. However, another significant contributing factor was the reported failure of her parents to fully understand, appreciate, and perform their role in this aspect of her care. This parental confusion and indifference to the plaintiff's treatment protocols, in turn, was part of a larger, ongoing tension between De La Cruz and her family.

Thus, on January 17, 2012, De La Cruz expressed apathy regarding her own compliance with the School Site program in New York, stating that she was moving to Pennsylvania anyway. (Tr. 164). Three days later on January 20, 2012, De La Cruz's father also indicated a basic confusion concerning his parental responsibility in ensuring that his daughter complied with her medication regime, stating that no one in the family gave the plaintiff her lithium, rather she was left as a minor child to undertake this task herself. At that time caregivers expressly admonished De La Cruz's father that an adult needs to take responsibility to administer medications for a child. (Tr. 164).

Treatment notes from February of 2012, indicated that De La Cruz displayed a continued lack of a caring attitude regarding school, and that De La Cruz's mother

8

was specifically counselled regarding her daughter's medication needs. (Tr. 167-69). The treatment notes also reflected some continued confusion regarding the parents' roles in ensuring their child's medication compliance. Thus, while De La Cruz's father claimed on February 16, 2012, that he was now giving medication to De La Cruz almost every day, De La Cruz advised that she was the one who needed to remind her parents to provide her these medications. (Tr. 172).

However, the treatment records from the School Site program indicated that when De La Cruz and her parents ensured that she was taking her medication, her condition improved significantly. (Tr. 180, 198). Conversely, when the family failed to maintain their eleven year old's medication compliance, her condition declined. (Tr. 190-96). By May of 2012, De La Cruz's condition was described as stable and she was reportedly in good spirits. (Tr. 137, 202). However, during an exit interview with De La Cruz's mother, caregivers once again emphasized their parental responsibility to obtain ongoing care for the plaintiff and instructed her mother to promptly arrange for mental health treatment  for De La Cruz in Pennsylvania. (Tr. 204). At the time of her discharge from the School Site program, De La Cruz's GAF school was as high as 60, (Tr. 139, 208), a score which was on the borderline between mild and moderate symptoms.

Despite having been informed of the need to maintain continuity of care for De La Cruz, it appears that a year elapsed before her parents arranged for her to receive further medical support in Pennsylvania. Following academic difficulties experienced by De La Cruz in Pennsylvania during the 2012-2013 academic year, a diagnostic interview conducted by Pressley Ridge on March 27, 2013, diagnosed her as bi-polar and found that De La Cruz's GAF score was 55, indicative of a moderate degree of impairment. (Tr. 273). An accompanying diagnostic interview dated March 28, 2013, contained a diagnosis of depression and ADHD, and stated that once De La Cruz and her family moved to Pennsylvania "the patient did not continue to receive treatment with lithium." (Tr. 275). Thus, it appears that De La Cruz's parents neglected to maintain this medication regime for their daughter despite having been advised in New York of the importance of continuity in care. (Tr. 204).[3] The interview notes also documented familial discord, (Tr. 275), while concluding that De La Cruz's thought processes were logical and goal oriented and her insight and cognition were good. (Tr. 276). In March of 2013, De La Cruz was assessed with a GAF score of 70, indicative of only mild impairment. (Id.)

---

[3] This inaction on the part of De La Cruz's parents is both unexplained and puzzling since they acknowledged during this March 2013 interview that medication compliance had been helpful in improving their daughter's mental state. (Tr. 275).

An evaluation of De La Cruz conducted by Dr. David Baker and Mary Blake, M.A., at T.W. Ponessa and Associates in May of 2013 reached similar diagnoses but arrived at somewhat different conclusions regarding the severity of her condition. (Tr. 305-14). In this evaluation, De La Cruz was diagnosed with a mood disorder which was exacerbated by stressors, including familial strife. (Tr. 313). However, the GAF score assigned to De La Cruz was 45, a score which was consistent with serious symptoms. (Id.) Yet while these caregivers assigned this GAF score to De La Cruz, a Childhood and Adolescent Needs and Strengths (CANS) assessment prepared by Blake at this time suggested that De La Cruz's impairments were less severe than initially noted. This multi-facetted screening assessment found that in thirty nine realms of functioning there was either no evidence of concern or only mild concern. (Tr. 309-10). Only six areas of functioning were rated as showing a moderate degree of concern. (Id.) A revaluation performed by Dr. Baker in May of 2014 reached similar results. (Tr. 294-304).

De La Cruz underwent a psychiatric admission at the Pennsylvania Psychiatric Institute in November 2013 following reports that she was engaging in increasing fights at school. (Tr. 321-24). At the time of her discharge, De La Cruz was diagnosed with mood disorders and was assessed a GAF score of 50. (Id.) Out-patient progress notes dated September 11, and December 18, 2014, found that De

11

La Cruz was mostly cooperative, displayed fair judgment and insight, and was demonstrating good compliance with her medications. (Tr. 327-28, 644-45). However, De La Cruz stated in November of 2014 that she was required to remind her mother that she needed medication, indicating that there was some degree of parental neglect in this area.

In February of 2015, De La Cruz was described as minimally cooperative, but showed fair judgment and insight and continued to comply with her medication regime. (Tr. 647-48). By April 2015, she was judged cooperative, maintained good medication compliance and demonstrated good judgment and insight. (Tr. 650-51). In July 2015, De La Cruz's care givers described her as minimally cooperative but stated she showed fair judgment and insight and continued to comply with her medication. (Tr. 653-54). Similar clinical impressions were reported in December 2015, when it was reported that De La Cruz was cooperative, had good medication compliance and judgment, and reflected a fair degree of insight. (Tr. 656-57).

Pennsylvania Psychiatric Institute treatment notes throughout 2016 reported some downward fluctuation in De La Cruz's medication compliance which ranged from good to poor, but continued to describe her as cooperative and generally characterized her judgment and insight as fair.  (Tr. 660-70). Likewise, treatment progress notes throughout 2017 were largely unremarkable and typically described

12

De La Cruz as cooperative, with logical thought processes, and good judgment and insight. (Tr. 671-79).

De La Cruz's academic performance during these years was uneven. She was enrolled in summer school during 2014, (Tr. 270-71), was placed in cyber school due to behavioral issues, and was afforded educational supports, but demonstrated frequent absenteeism and marginal academic performance. (Tr. 571-607). She did not complete high school.

From March of 2019 through January of 2022, De La Cruz received care and counseling through Pennsylvania Counseling Services. (Tr. 1268-1637). During this two and one half year period De La Cruz often attended weekly counseling sessions. The notes of these regular clinical encounters generally described the severity of her symptoms as moderate, and consistently indicated that she had a good or very good capacity to respond to treatment. (Id.) For the most part, De La Cruz appeared to be making either good or limited progress in her treatment, although there were instances in which it was reported that her progress had stalled and in a few isolated instances counselors noted episodes of regression on her part. (Id.) However, the treatment notes, read as a whole, do not describe a disabling level of emotional impairment. Quite the contrary, these notes document that during much of this time De La Cruz was working, since De La Cruz regularly reported on workplace stresses

13

during her counseling session. (Tr.1390, 1395-96, 1409-11, 1437, 1468, 1474-75, 1510).

### C. **The Opinion Evidence**

In addition to these extensive clinical records, and the various conflicting GAF assessments provided over time by treating sources, the administrative record contained several opinions regarding De La Cruz's capabilities from medical and non-medical sources. All of these opinions, however, were dated, and related exclusively to De La Cruz's mental state as a child.

For example, on May 29, 2013, a state agency expert, Dr. Soraya Amanullah, performed a childhood disability evaluation which concluded that De La Cruz was not disabled since she only showed less than marked impairments in attending and competing tasks as well as relating to others and was otherwise unimpaired. (Tr. 52-58). Likewise, on May 13, 2013, one of De La Cruz's teachers, Kristen Hartsock, completed  a Teacher's Questionnaire relating to De La Cruz's performance in school. (Tr. 251-60). While Ms. Hartsock observed that De La Cruz seemed, depressed and was frequently absent from school, (Tr. 253, 259), she concluded that De La Cruz had no difficulty relating with others, moving and manipulating objects, or caring for herself. (Tr. 256-58). In the realms of acquiring information and

completing tasks, Ms. Hartsock generally rated De La Cruz as experiencing slight problems. (Tr. 254-55).

### D. De La Cruz's Employment History

In addition to this clinical and opinion evidence, by the time of De La Cruz's latest ALJ hearing in 2022 several other significant intervening events had taken place. De La Cruz had given birth to a son for whom she served as a primary caregiver, (Tr. 884-86, 888), and had been employed at a Burger King restaurant beginning in 2019. (Tr. 886, 1117-1245). In fact, De La Cruz had been promoted at Burger King to a shift supervisor, albeit with some employer accommodations to address workplace stresses. (Tr. 887, 1267). Thus, by the time of her 2022 disability hearing, De La Cruz had been actively engaged in the workforce for nearly three years.

### E. De La Cruz's Litigation History

As we have noted, this disability application has a painfully protracted administrative and legal history which began on March 6, 2013, when De La Cruz's mother submitted a childhood disability benefit application on behalf of her minor daughter alleging an onset of disability on January 1, 2011. (Tr. 16). According to De La Cruz's initial disability application her disabling impairments were ADHD and an affective disorder. (Tr. 19).

15

There have now been three separate ALJ hearings and decisions relating to this claim of disability. At the outset, on October 7, 2014, an ALJ conducted a hearing in this case. (Tr. 32-50, 476-95). Following that hearing the ALJ issued a decision denying De La Cruz's application for childhood benefits. (Tr. 10-28, 408, 29).  De La Cruz appealed this adverse decision and on November 15, 2017, this Court, Nealon J., ordered the case remanded for further consideration by the Commissioner. (Tr. 440-67). In reaching this result, the Court found that the ALJ had erred by failing to discuss Dr. Baker's opinion and by placing undue weight on the state agency expert and teacher evaluations in the analysis of this childhood disability claim. (Tr. 465). Accordingly, the case was remanded to the Commissioner for further consideration of this evidence. (Tr. 467).

A second ALJ hearing was then conducted. By this time De La Cruz had attained the age of 18, so her case was assessed both as a childhood and an adult disability claim.  On March 28, 2019, an ALJ issued a second decision denying  De La Cruz's claims. (Tr. 907-945). In this decision, the ALJ concluded, in part, that the evidence showed that when she took her medications, De La Cruz's emotional impairments responded well to treatment and therefore were not entirely disabling. (Id.) Thus, the ALJ's decision took into account De La Cruz's periodic failure to comply with her medication instructions in making this disability determination. De

16

La Cruz appealed this second adverse determination and, on November 16, 2020, this Court, Schwab, M.J., issued an opinion and order remanding the case further examination of a narrow issue. (Tr. 946-977). Specifically, the Court found that the ALJ erred in considering De La Cruz's non-compliance with her medication regime in this disability analysis without also explicitly addressing the degree to which her emotional impairments may have contributed to this noncompliance. (Tr. 972-76).

It was against the backdrop of these prior decisions, which called upon the ALJ to reexamine some medical opinion evidence and further instructed the ALJ to address what factors contributed to De La Cruz's failure to consistent adhere to her medication guidance, that this claim came to be heard on a third occasion.

### F. **The Current ALJ Decision**

On February 11, 2022, a third ALJ hearing was conducted in this case. (Tr. 875-906). De La Cruz testified at this hearing, describing her employment at Burger King, and noting that she had been promoted to a shift supervisor position. (Tr. 886-87). De La Cruz also described her activities of daily living which included serving as the primary caregiver for her two year old son, cooking, cleaning, caring for herself, and providing groceries for her family. (Tr. 888, 895-96).

A vocational expert also testified. (Tr. 900-06). In his testimony the expert described the intellectual and emotional demands of De La Cruz's current ongoing

employment. (Tr. 900). In response to hypothetical questions posed by the ALJ, the expert then identified a series of less emotionally taxing jobs that existed in the national economy which De La Cruz could perform. (Tr. 901-02).

On March 28, 2022, the ALJ issued a detailed decision denying De La Cruz's disability application. (Tr. 839-868). In this decision, the ALJ evaluated this claim against booth the childhood and adult disability standards. (Tr. 841-44). At Step 1 of this sequential analysis, the ALJ noted that De La Cruz was born on May 24, 2000; was an adolescent on March 6, 2013, the application date; and attained age of eighteen (18) on May 23, 2018. (Tr. 844).

The ALJ then found that De La Cruz had engaged in ongoing employment from 2019 through 2022 and had received a promotion at her work. (Tr. 844-45). However, affording the plaintiff the benefit of the doubt due to her workplace stress accommodations, the ALJ concluded that:

> I will not find that the claimant has engaged in substantial gainful activity from the third quarter of 2019 to present despite the substantial gainful activity level appearing earnings, [and instead] will proceed with the sequential evaluation process and find the claimant not to be disabled at step five (5) of the sequential evaluation process.

(Tr. 845).

At Step 2 of this sequential analysis the ALJ found that De La Cruz experienced the following severe emotional impairments: major depressive disorder,

18

bipolar disorder, generalized anxiety disorder, conduct disorder and attention deficit hyperactivity disorder ("ADHD"). (Tr. 845).

Analyzing De La Cruz's claim under the childhood disability framework, the ALJ then made the following findings:

> I must consider how the claimant functions in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. To functionally equal the listings, the claimant's impairment or combination of impairments must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. Our rules explain that a claimant has a "marked" limitation in a domain when her impairment(s) "interferes seriously" with the ability to independently initiate, sustain, or complete activities, and a claimant has an "extreme" limitation" in a domain when her impairment(s) "interferes very seriously" with these same abilities. In making this assessment, I must compare how appropriately, effectively and independently the claimant performs activities compared to the performance of other children of the same age who do not have impairments (20 CFR 416.926a). Based on the requirements of 20 CFR 416.924a(a) and SSR 09-2p, I have considered all of the relevant evidence in the case record. "All of the relevant evidence" includes objective medical evidence and other relevant evidence from medical sources; information from other sources, such as school teachers, family members, or friends; the claimant's statements (including statements from the claimant's parent(s) or other caregivers); and any other relevant evidence in the case record, including how the claimant functions over time and in all settings (i.e., at home, at school, and in the community).

> I find that the claimant has:

> • less than a marked limitation in acquiring and using information;
> • less than a marked limitation in attending and completing tasks;

• a marked limitation in interacting and relating with others;
• no limitation in moving about and manipulating objects;
• less than a marked limitation in the ability to care for herself; and
• no limitation in health and physical well-being.

In determining the degree of limitation in each of the six domains of functioning, I have considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSR 09-2p through 8p, and 16-3p.

(Tr. 846-47).

The ALJ supported this childhood disability determination with a detailed analysis of De La Cruz's juvenile medical history, activities of daily living, and academic performance. (Tr. 847-853). This analysis also specifically complied with the Court's mandate that the ALJ assess the degree to which De La Cruz's emotional impairments contributed to her failure to abide by a medication regime which seemed to clearly improve her functioning. On this score the ALJ found that the inattention of De La Cruz's parents was a significant contributing factor in her uneven drug compliance, stating that:

This record establishes that the claimant realized improvement in attitude, moodiness and attentional issues when she underwent medication management as directed. Unfortunately, the record documents that the claimant frequently failed to undergo medication management as directed sometimes due to a failure on the part of her guardians to ensure that she took medication, the reported lack of efficacy of any medication aside from Lithium when taken consistently and sometimes for no reason. It also appears that there were times

during which the claimant's guardians did not ensure that the claimant attended therapy as recommended. Moreover, although the importance of attending structured activities with peers repeatedly was stressed to the claimant and her mother, notes of treatment suggest that the claimant's mother feared allowing the claimant to take part in such activities.

(Tr. 853).

The ALJ also evaluated this childhood disability claim against De La Cruz's activities of daily living, observing that:

> The claimant's activities of daily living similarly are not suggestive of a disabling level of impairment prior to attaining age eighteen (18). It appears that the claimant lived with her mother, father and siblings prior to attaining age eighteen (18). While the claimant had a Section 504 plan at school starting in the spring of 2016, the claimant has not received any learning support services throughout her schooling. Although the claimant's academic performance has appeared poor and she has repeated grades, the claimant had significant absences and tardy appearances throughout her schooling that likely contributed to her poor academic performance. It appears that fearfulness of the claimant's mother prevented the claimant's participation in structured activities with peers. In fact, when the claimant was permitted to have a peer over and to engage with peers, she did well. The claimant was able to spend summer vacation in 2017 in New York, and she participated in a school art show. The claimant helped to care for her infant niece when her niece was at the house. These activities of daily living are not consistent with a disabling level of impairment.

(Tr. 854).

Further, the ALJ followed this Court's guidance and engaged in a comprehensive assessment of the medical opinion evidence. On this score, the ALJ found that:

As the opinion evidence pertains to the claimant's functional abilities prior to attaining age eighteen (18), I considered discharge instructions on May 30, 2014 indicating that the claimant has no physical restrictions (Exhibit 5F). To the extent that the discharge instructions are suggestive that the claimant has no limitation in moving about and manipulating objects, they are supported by the record establishing no limitation in the claimant's physical abilities or ability to participate in activities. For these reasons, this statement is given significant weight.

The record contains various Child and Adolescent Needs and Strengths ("CANS") Assessments with scores of the assessments ranging from zero to three with zero being reflective of "no need or problem in an area", one being reflective of "a problem that might require attention," two being reflective of "an area where a child may have some potential for a strength with that strength not yet having been developed" and three being reflective of "a need for intense or immediate action." I considered the opinion of Courtney Schaub, M.A. and Michael Boerger, M.S., the claimant's psychology providers, who indicated in a CANS assessment on April 27, 2015 that the claimant had zero (0) three scores, eight (8) two scores, ten (10) one scores and seven (7) zeros scores (Exhibit 11F). I considered the opinion of Mary L. Blake, MA, and David Baker, Psy.D., the claimant's psychology providers, who indicated in a CANS assessment on October 7, 2014 that the claimant had zero (0) three scores, fourteen (14) two scores, four (4) one scores and seven (7) zero scores. On May 9, 2014, these providers assessed the claimant with zero (0) three scores, thirteen (13) two scores, six (6) one scores and six (6) zero scores. On November 19, 2013, these providers assessed the claimant with two (2) three scores, twelve (12) two scores, three (3) one scores and eight (8) zero scores (Exhibit 11F). On May 14, 2013, these providers assessed the claimant in a more expanded assessment with zero (0) three scores, six (6) two scores, eleven (11) one scores and twenty-eight (28) zero scores (Exhibit 4F). While it appears that these providers are treatment providers and Dr. Baker signed some of the reports in which the CANS assessments appear, M.A. Blake indicated that she actually completed the CANS assessments in the reports that she authored. Nonetheless, I consider the CANS assessments to be opinions of the providers who signed onto the reports.

22

Of the collective CANS assessments, there are only two (2) scores of three (3) reflective of "a need for intense or immediate action." While there are fifty-three (53) scores of 2 reflective of "a strength that is not yet "developed," scores of one total fifty-one (51) and scores of zero total fifty-six (56), scores that are reflective of "no need" or "needs that potentially may require attention." The lower need scores far outweigh the more intensive need scores. To the extent that the scores of predominantly ones and twos are suggestive of less than marked limitation in all functional domains except for interacting and relating with others, they are supported by the record indicating that the claimant realized improvement in mental health with medication management with some aggravations in symptoms occurring when medications were not administered as directed sometimes due to failure on the part of the claimant's guardians and the significant absences from school that may have contributed to the claimant's failure to achieve at school. They also are supported by the claimant's election to attend Cyber School without being compelled to do so due to any disciplinary infractions, the fact that the claimant has not been tested for a learning and cognitive impairment or received learning support services and the claimant's ability to focus for long periods of time on social media and to engage with peers with the same. For these reasons, the CANS assessments are given significant weight to the extent that they collectively are not suggestive of extreme or marked limitation in any functional domain aside from marked limitation in interacting and relating with others.

I considered the observations of Kristen Hartsock, the claimant's sixth grade literacy, geography and homeroom teacher, who indicated on May 13, 2013 that the claimant has a very serious problems completing assignments; an obvious problem comprehending and doing math problems, applying problem solving skills in class discussions and working at a reasonable pace; a slight problem comprehending oral instructions, understanding and participating in class discussions, providing adequate and organized explanations, expressing ideas in written form, learning new material, recalling and applying previously learned material, paying attention when spoken to directly, focusing long enough to finish tasks, refocusing to task, carrying out multistep

23

instructions, changing activities without disruption, organizing her things, completing work accurately and working without distraction; and no problem understanding vocabulary, reading and comprehending written material, sustaining attention during play, carrying out single step instructions, waiting to take turns, interacting and relating with others, moving about and manipulating objects or caring for herself (Exhibit 7E). While I am aware and recognize that this teacher does not appear to be an acceptable medical source, I also recognize that this individual is an educator who has worked with the claimant in an educational environment for nearly the entire 2012-2013 school year. As such, this individual would appear to have first have knowledge of the claimant's functional abilities at school during that period of time. Although these observations were rendered several years ago on May 13, 2013, and subsequent events have occurred since they were rendered, they nonetheless were rendered after the protective filing date in this case when the claimant certainly is seeking benefits. To the extent that the observations are suggestive of less than marked limitation in all functional domains except for interacting and relating with others, they are supported by the record indicating that the claimant realized improvement in mental health with medication management with some aggravations in symptoms occurring when medications were not administered as directed sometimes due to failure on the part of the claimant's guardians and the significant absences from school that may have contributed to the claimant's failure to achieve at school. They also are supported by the claimant's election to attend Cyber School without being compelled to do so due to any disciplinary infractions, the fact that the claimant has not been tested for a learning and cognitive impairment or received learning support services and the claimant's ability to focus for long periods of time on social media and to engage with peers with the same. For these reasons, these observations are given partial weight.

I considered the opinion of Soraya Amanullah, Ph.D., the State Agency psychological consultant, who indicated on May 29, 2013 that the claimant has less than marked limitation in attending and completing tasks and interacting and relating with others and no limitation in acquiring and using information, moving about and manipulating objects, caring for herself and health and physical wellbeing (Exhibit

24

1A). While I recognize that this opinion was rendered after the protective filing date in this case, I also recognize that it was rendered several years ago and prior to the occurrence of subsequent events. I find that Dr. Amanullah's opinion that the claimant has less than marked limitation in interacting and relating does not reflect the totality of evidence, including subsequent evidence which supports my finding that the claimant has a marked limitation in interacting and relating with others. However, to the extent that the remainder of the limitations are suggestive of less than marked or no limitation in the other functional domains, they are consistent with the totality of evidence in the record indicating that the claimant realized improvement in mental health with medication management with some aggravations in symptoms occurring when medications were not administered as directed sometimes due to failure on the part of the claimant's guardians and the significant absences from school that may have contributed to the claimant's failure to achieve at school. They also are supported by the claimant's election to attend Cyber School without being compelled to do so due to any disciplinary infractions, the fact that the claimant has not been tested for a learning and cognitive impairment or received learning support services and the claimant's ability to focus for long periods of time on social media and to engage with peers with the same. For these reasons, this opinion is given partial weight.

The record contains GAF assessment scores of 40 to 70 rendered between September 23, 2008 and November 12, 2014 (1E, 1F, 4F, 6F, 8F, 11F). While it appears that the GAF assessment scores were rendered by treatment providers, I recognize that the GAF assessment scores represent a subjective assessment of an area of the claimant's functioning at a specific time based upon information provided by the claimant and/or third parties, not an objective representation of the claimant's overall functioning over a longitudinal period of time. Further, some of these scores were rendered before the protective filing date in this case, and all scores were rendered well before the present time or the claimant's attainment of age eighteen (18). However, to the extent that the scores of 55 and higher are suggestive of no more than marked limitation in interacting and relating with others and less than marked or no limitation in all other functional domains, they are supported by the record indicating that the claimant realized

improvement in mental health with medication management with some aggravations in symptoms occurring when medications were not administered as directed sometimes due to failure on the part of the claimant's guardians and the significant absences from school that may have contributed to the claimant's failure to achieve at school. They also are supported by the claimant's election to attend Cyber School without being compelled to do so due to any disciplinary infractions, the fact that the claimant has not been tested for a learning and cognitive impairment or received learning support services and the claimant's ability to focus for long periods of time on social media and to engage with peers with the same. For these reasons, the GAF assessment scores are given partial weight.

(Tr. 854-57).

Based upon these detailed findings the ALJ concluded that De La Cruz was not disabled prior to attaining age eighteen (18). (Tr. 857).

The ALJ then separately evaluated De La Cruz's disability claim after she had attained the age of eighteen. (Tr. 858-68). As part of this analysis, the ALJ concluded that De La Cruz's impairments were not *per se* disabling when viewed in the context of adult disability claims. (Tr. 858-860). Applying the adult disability analytical paradigm the ALJ then fashioned the following residual functional capacity assessment for De La Cruz:

After careful consideration of the entire record, I find that since the claimant attained age eighteen (18), she has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant retains the mental capacity to perform simple and routine tasks, to make simple work related decisions, to tolerate occasional changes in the work setting and

to tolerate occasional interaction with the public and coworkers, but never to work at a production rate pace.

(Tr. 860).

Once again, this RFC determination rested upon a carefully detailed discussion of the plaintiff's clinical history and activities of daily living. (Tr. 860-67). Having fashioned this RFC for De La Cruz, the ALJ then determined that there were jobs that existed in significant numbers in the national economy that she could perform. (Tr. 867). Based upon these determinations, the ALJ found that De La Cruz had not met the exacting standards for adult disability and denied this claim. (Tr. 868).

This appeal followed. (Doc. 1). On appeal De La Cruz argues that the ALJ failed to comply with the prior remand orders; erred in the evaluation of De La Cruz's childhood and adult disability claims; failed to properly assess the opinion evidence; erred in assessing he severity of the plaintiff's reported symptoms; and propounded improper hypothetical questions. This appeal is fully briefed and is, therefore, ripe for resolution.

While we acknowledge the many challenges De La Cruz has faced in her life, mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings in

this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner.

## III.  <u>Discussion</u>

### A.  <u>Child Disability Claims: Initial Burdens of Proof, Persuasion and Articulation for the ALJ</u>

The legal standards which govern an ALJ's consideration of a childhood disability claim under the Act are familiar ones.

The Social Security Act provides that in order to qualify for disability benefits, a child must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I). The Commissioner has interpreted this statutory provision in regulations which provide that a child whose condition meets, medically equals, or functionally equals the criteria of a listed impairment must be found disabled. Similarly, a child whose impairment(s) do not meet or equal (medically or functionally) the listing criteria contained in 20 C.F.R. Part 404, Subpart P, Appendix 1 is not disabled. 20 C.F.R. § 416.924(a).

Under these regulations, when determining the issue of functional equivalence to a listed impairment, there are six domains of functioning which an ALJ must consider: (1) Acquiring and Using Information; (2) Attending and Completing

28

Tasks; (3) Interacting and Relating with Others; (4) Moving about and Manipulating Objects; (5) Caring for Yourself; and (6) Health and Physical Well-Being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). In order to establish a disabling level of functional equivalence to a listed impairment, an ALJ must conclude that a child exhibits either a "marked" limitation in two of these six domains, or an "extreme" limitation in any single domain. 20 C.F.R. § 416.926a(d). The Commissioner defines a "marked" limitation as one which:

> interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-today functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. 'Marked' limitation also means a limitation that is 'more than moderate' but 'less than extreme.' It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

20 C.F.R. § 416.926a(e)(2).

> The Commissioner then defines an "extreme" limitation as one which:

> interferes very seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be very seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. 'Extreme' limitation also means a limitation that is 'more than marked.' 'Extreme' limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

29

20 C.F.R. § 416.926a(e)(3).

**B.    Initial Burdens of Proof, Persuasion, and Articulation for the ALJ in Adult Claims**

To receive benefits under the Social Security Act as an adult by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3)

whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an

31

assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration

when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this

burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

## C.    <u>Substantial Evidence Review – the Role of this Court</u>

Once the ALJ has rendered a decision, it is our duty to evaluate this ruling judging the ALJ's analysis against familiar and deferential standards of review. When reviewing the Commissioner's final decision denying a claimant's application

for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F.Supp.2d 533, 536 (M.D. Pa. 2012).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla.  Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole."  Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that [she] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F.Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status

of a claim requires the correct application of the law to the facts"); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use

particular language or adhere to a particular format in conducting his analysis." <u>Jones</u>, 364 F.3d at 505.

<u>Diaz v. Comm'r of Soc. Sec.</u>, 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

This principle applies with particular force to legal challenges, like the claim made here, based upon alleged inadequacies in the articulation of a claimant's mental RFC. In <u>Hess v. Comm'r Soc. Sec.</u>, 931 F.3d 198, 212 (3d Cir. 2019), the United States Court of Appeals addressed the standards of articulation that apply in this setting. In <u>Hess</u>, the court of appeals considered the question of whether an RFC, which limited a claimant to simple tasks, adequately addressed moderate limitations on concentration, persistence, and pace. In addressing the plaintiff's argument that the language used by the ALJ to describe the claimant's mental limitations was legally insufficient, the court of appeals rejected a *per se* rule which would require the ALJ to adhere to a particular format in conducting this analysis. Instead, framing this issue as a question of adequate articulation of the ALJ's rationale, the court held that, "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration,

persistence, or pace.'" <u>Hess v. Comm'r Soc. Sec.</u>, 931 F.3d 198, 211 (3d Cir. 2019). On this score, the appellate court indicated that an ALJ offers a valid explanation for a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, . . . . " <u>Hess v. Comm'r Soc. Sec.</u>, 931 F.3d 198, 214 (3d Cir. 2019).

In our view, the teachings of the <u>Hess</u> decision are straightforward. In formulating a mental RFC, the ALJ does not need to rely upon any particular form of words. Further, the adequacy of the mental RFC is not gauged in the abstract. Instead, the evaluation of a claimant's ability to undertake the mental demands of the workplace will be viewed in the factual context of the case, and a mental RFC is sufficient if it is supported by a valid explanation grounded in the evidence.

D.    **Legal Benchmarks for the ALJ's Assessment of a Claimant's Alleged Symptoms**

The interplay between the deferential substantive standard of review that governs Social Security appeals, and the requirement that courts carefully assess whether an ALJ has met the standards of articulation required by law, is also illustrated by those cases which consider analysis of a claimant's reported

symptoms. When evaluating lay testimony regarding a claimant's reported

symptoms we are reminded that:

> [T]he ALJ must necessarily make certain credibility determinations,
> and this Court defers to the ALJ's assessment of credibility. See Diaz v.
> Comm'r, 577 F.3d 500, 506 (3d Cir.2009) ("In determining whether
> there is substantial evidence to support an administrative law judge's
> decision, we owe deference to his evaluation of the evidence [and]
> assessment of the credibility of witnesses...."). However, the ALJ must
> specifically identify and explain what evidence he found not credible
> and why he found it not credible. *Adorno v. Shalala,* 40 F.3d 43, 48 (3d
> Cir.1994) (citing *Stewart v. Sec'y of Health, Education and Welfare,*
> 714 F.2d 287, 290 (3d Cir.1983)); see also Stout v. Comm'r, 454 F.3d
> 1050, 1054 (9th Cir.2006) (stating that an ALJ is required to provide
> "specific reasons for rejecting lay testimony"). An ALJ cannot reject
> evidence for an incorrect or unsupported reason. Ray v. Astrue, 649
> F.Supp.2d 391, 402 (E.D.Pa.2009) (quoting Mason v. Shalala, 994 F.2d
> 1058, 1066 (3d Cir.1993)).

Zirnsak v. Colvin, 777 F.3d 607, 612–13 (3d Cir. 2014).

Yet, it is also clear that:

> Great weight is given to a claimant's subjective testimony only when it
> is supported by competent medical evidence. Dobrowolsky v. Califano,
> 606 F.2d 403, 409 (3d Cir. 1979); accord Snedeker v. Comm'r of Soc.
> Sec., 244 Fed.Appx. 470, 474 (3d Cir. 2007). An ALJ may reject a
> claimant's subjective testimony that is not found credible so long as
> there is an explanation for the rejection of the testimony. Social
> Security Ruling ("SSR") 96–7p; Schaudeck v. Comm'r of Social
> Security, 181 F.3d 429, 433 (3d Cir. 1999). Where an ALJ finds that
> there is an underlying medically determinable physical or mental
> impairment that could reasonably be expected to produce the
> individual's pain or other symptoms, however, the severity of which is
> not substantiated by objective medical evidence, the ALJ must make a
> finding on the credibility of the individual's statements based on a
> consideration of the entire case record.

McKean v. Colvin, 150 F.Supp.3d 406, 415–16 (M.D. Pa. 2015) (footnotes omitted). Thus, we are instructed to review an ALJ's evaluation of a claimant's subjective reports under a standard of review which is deferential with respect to the ALJ's well-articulated findings but imposes a duty of clear articulation upon the ALJ so that we may conduct meaningful review of the ALJ's conclusions.

In the same fashion that medical opinion evidence is evaluated, the Social Security Rulings and Regulations provide a framework under which the severity of a claimant's reported symptoms are to be considered. 20 C.F.R. §§ 404.1529, 416.929; SSR 16–3p. It is important to note that though the "statements of the individual concerning his or her symptoms must be carefully considered, the ALJ is not required to credit them." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 363 (3d. Cir. 2011) (referencing 20 C.F.R. §404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled"). It is well settled in the Third Circuit that "[a]llegations of pain and other subjective symptoms must be supported by objective medical evidence." Hantraft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999) (referring to 20 C.F.R. § 404.1529). When evaluating a claimant's symptoms, the ALJ must follow a two-step process in which the ALJ resolves whether a medically determinable impairment could be the cause of the symptoms

alleged by the claimant, and subsequently must evaluate the alleged symptoms in consideration of the record as a whole. SSR 16-3p.

First, symptoms, such as pain or fatigue, will only be considered to affect a claimant's ability to perform work activities if such symptoms result from an underlying physical or mental impairment that has been demonstrated to exist by medical signs or laboratory findings. 20 C.F.R. §§ 404.1529(b), 416.929(b); SSR 16–3p. During the second step of this credibility assessment, the ALJ must determine whether the claimant's statements about the intensity, persistence, or functionally limiting effects of his or her symptoms are substantiated based on the ALJ's evaluation of the entire case record. 20 C.F.R. § 404.1529(c), 416.929(c); SSR 16–3p. This includes but is not limited to medical signs and laboratory findings, diagnoses, and other medical opinions provided by treating or examining sources, and other medical sources, as well as information concerning the claimant's symptoms and how they affect his or her ability to work. Id. The Social Security Administration has recognized that individuals may experience their symptoms differently and may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments, signs, and laboratory findings. SSR 16–3p.

Thus, to assist in the evaluation of a claimant's subjective symptoms, the Social Security Regulations identify seven factors which may be relevant to the assessment of the severity or limiting effects of a claimant's impairment based on a claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). These factors include: activities of daily living; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her symptoms; treatment, other than medication that a claimant has received for relief; any measures the claimant has used to relieve his or her symptoms; and, any other factors concerning the claimant's functional limitations and restrictions. Id.; see Koppenaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1995999, at *9 (M.D. Pa. Apr. 8, 2019), report and recommendation adopted sub nom. Koppenhaver v. Berryhill, No. 3:18-CV-1525, 2019 WL 1992130 (M.D. Pa. May 6, 2019); Martinez v. Colvin, No. 3:14-CV-1090, 2015 WL 5781202, at *8–9 (M.D. Pa. Sept. 30, 2015); George v. Colvin, No. 4:13–CV–2803, 2014 WL 5449706, at *4 (M.D. Pa. Oct. 24, 2014).

**E.** **Legal Benchmarks for the ALJ's Assessment of Medical Opinion Evidence**

The Commissioner's regulations which were in effect at the time that the case commenced in 2013[4] also set standards for the evaluation of medical evidence and defined medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairments(s), and [a claimant's] physical or mental restrictions." 20 C.F.R. §404.1527(a)(2). Regardless of its source, the ALJ is required to evaluate every medical opinion received. 20 C.F.R. §404.1527(c).

In deciding what weight to afford competing medical opinions and evidence under these regulations, the ALJ is guided by factors outlined in 20 C.F.R. §404.1527(c). "The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96-6p, 1996 WL 374180 at *2. Treating sources have the closest ties to the claimant, and therefore their opinions generally entitled to more weight. See 20 C.F.R. §404.1527(c)(2) ("Generally, we give more weight to

---

[4] In 2017 the Commissioner revised these regulations. These revisions are applicable only to cases commenced after March 2017.

opinions from your treating sources..."); 20 C.F.R. §404.1502 (defining treating source). Under some circumstances, the medical opinion of a treating source may even be entitled to controlling weight. 20 C.F.R. §§04.1527(c)(2); see also SSR 96-2p, 1996 WL 374188 (explaining that controlling weight may be given to a treating source's medical opinion only where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it is not inconsistent with the other substantial evidence in the case record).

Where no medical source opinion is entitled to controlling weight, the Commissioner's regulations direct the ALJ to consider the following factors, where applicable, in deciding the weight given to any non-controlling medical opinions: length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; the extent to which the source presented relevant evidence to support his or her medical opinion, and the extent to which the basis for the source's conclusions were explained; the extent to which the source's opinion is consistent with the record as a whole; whether the source is a specialist; and, any other factors brought to the ALJ's attention. 20 C.F.R. §404.1527(c). These benchmarks, which emphasized consideration of the nature of the treating relationship, called for careful consideration of treating source opinions. Thus, an ALJ could not unilaterally reject a treating source's opinion and substitute the

45

judge's own lay judgment for that medical opinion. However, the ALJ may discount such an opinion when it conflicts with other objective tests or examination results. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 202–03 (3d Cir. 2008). Likewise, an ALJ may conclude that discrepancies between the treating source's medical opinion and the doctor's actual treatment notes justifies giving a treating source opinion little weight in a disability analysis. Torres v. Barnhart, 139 F. App'x 411, 415 (3d Cir. 2005). Finally, "an opinion from a treating source about what a claimant can still do which would seem to be well-supported by the objective findings would not be entitled to controlling weight if there was other substantial evidence that the claimant engaged in activities that were inconsistent with the opinion." Tilton v. Colvin, 184 F.Supp.3d 135, 145 (M.D. Pa. 2016).  Yet, in all instances the ALJ's decision, including any ALJ judgments on the weight to be given to  medical opinions, must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter, 642 F.2d at 704.

These legal cairns guide us in the assessment of De La Cruz's case.

## F. The ALJ's Decision is Supported by Substantial Evidence.

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial

evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, <u>Richardson</u>, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence," <u>Pierce</u>, 487 U.S. at 565, but rather "means— and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " <u>Biestek</u>, 139 S. Ct. at 1154. Judged against these deferential standards of review, we find that substantial evidence supported the ALJ's decision that De La Cruz was not entirely disabled.

At the outset, the plaintiff argues that the ALJ's most recent decision failed to comply with this Court's prior remand orders. We disagree. To be sure "[d]eviation from the court's remand order in the subsequent administrative proceedings is itself legal error, subject to reversal on further judicial review." <u>Sullivan v. Hudson</u>, 490 U.S. 877, 886, 109 S. Ct. 2248, 2254–55, 104 L. Ed. 2d 941 (1989). However, in our view the ALJ's latest analysis paid full fidelity to our prior remand decisions. Fairly, construed neither of those prior rulings dictated a final outcome to the ALJ in De La Cruz's case. Rather, Judge Nealon's initial remand decision simply admonished the ALJ to address Dr. Baker's opinion, while enjoining the ALJ from placing undue weight on the opinions of the state agency expert and De La Cruz's teacher. Likewise, Judge Schwab's second remand decision expressly eschewed any final merits decision, noting " we cannot say that substantial evidence on the record as a

whole indicates that De Law Cruz is disabled and entitled to benefits." (Tr. 976). Instead, the Court's remand order simply stated that the ALJ could not consider the plaintiff's improvement when she complied with her medication without also explicitly addressing the degree to which her emotional impairments may have contributed to this noncompliance. (Tr. 972-76).

Fairly read, the ALJ's current decision fully addressed all of these remand instructions. Thus, the ALJ followed Judge Nealon's instructions and declined to give substantial weight to either the state agency expert's opinion or the opinion of De La Cruz's teacher. Instead, these opinions—which were supported by substantial independent evidence—were given only partial weight. There was no error on this score. At the outset, it is well-settled that "State agent opinions merit significant consideration" in any Social Security disability analysis. Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Therefore, the ALJ properly considered and assigned partial weight to the opinion of the state agency expert. Likewise, contrary to De La Cruz's assertion, the ALJ was obliged to consider the teacher questionnaire completed by Ms. Hartsock in conducting this disability analysis. On this score, the law is clear:

> The Social Security Administration considers "all evidence" in a case record in determining childhood disability, including information from nonmedical sources, such as teachers. 20 C.F.R. § 416.924a(a). To that end, the Social Security Administration "will ask for information from

[a child's] teachers and other school personnel about how [the child is] functioning there on a day-to-day basis compared to other children [of the same] age who do not have impairments" and "will ask for any reports that the school may have that show the results of formal testing or that describe any special education instruction or services, including home-based instruction, or any accommodations provided in a regular classroom." 20 C.F.R. § 416.924a(a)(2)(iii); see also id. at § 416.924a(b)(7)(ii) ("If you go to school or preschool, we will ask your teacher(s) about your performance in your activities throughout your school day. We will consider all the evidence we receive from your school, including teacher questionnaires ...."); SSR 09-2p ("Evidence from other sources who are not medical sources and who know and have contact with the child can also be very important to our understanding of the severity of a child's impairment(s) and how it affects day-to-day functioning. These sources include ... educational personnel (for example, teachers[).]"). Notably, as "[n]on-medical sources[,]" teachers and school counselors are "valuable sources of evidence for assessing impairment severity and functioning. Often, these sources have close contact with the individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time." SSR 06-03p.

Lashell L. on behalf of D.J. v. Kijakazi, No. 1:19-CV-20033, 2021 WL 3088213, at *8 (D.N.J. July 22, 2021). In fact, it would have been error for the ALJ to entirely ignore this teacher questionnaire. Id. Therefore, the ALJ properly considered this questionnaire and appropriately gave it only partial weight in this disability evaluation.

The ALJ also complied with Judge Nealon's directive to address the treating source opinion of Dr. Baker. That opinion was discussed at length in the ALJ's decision, but the ALJ aptly noted that the more extreme assessments made by the

doctor were not entirely consistent with his own treatment notes and CANS evaluations and were inconsistent with the treatment notes and GAF scores assessed by other caregivers, who generally described the plaintiff's impairments as moderate in severity. Substantial evidence supported this evaluation of Dr. Baker's opinion, and the inconsistencies between the opinion and other medical evidence constituted valid grounds for giving the treating source opinion of Dr. Baker less weight. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 202–03 (3d Cir. 2008); Torres v. Barnhart, 139 F. App'x 411, 415 (3d Cir. 2005). Finally, the ALJ's decision adequately addressed the concerns cited by Judge Schwab in her remand decision in that it explained that De La Cruz's non-compliance with her medication regime was the result of a confluence of factors including to a significant degree inattention to drug compliance by the plaintiff's parents, who were admonished to ensure that she adhered to her medication schedule but often failed to do so. There was no error here.

De La Cruz also contends that the ALJ failed to adequately consider the medical opinion evidence, but the thorough treatment of that evidence in this latest ALJ decision rebuts this claim. Read as a whole, the ALJ's decision shows a careful consideration of the wide array of medical and lay opinions, all of which were examined and evaluated in light of De La Cruz's activities of daily living and the

clinical record. These opinions were then given partial weight, but only to the extent that they were factually well-supported. Moreover, substantial evidence; that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' " <u>Biestek</u>, 139 S. Ct. at 1154, supported this aspect of the ALJ's decision. In particular, the ALJ's Step 3 evaluation of the plaintiff's childhood disability claim drew substantial support from treatment notes, GAF scores, and various source opinions which generally described her impairments as no more than moderate in severity. Likewise, the ALJ's simple tasks adult RFC was consistent with the greater weight of the credible opinion testimony; was congruent with treatment records which generally documented no more than moderate impairment; and was in accord with De La Cruz's activities of daily living which included employment as a fast food shift supervisor.

In addition, the plaintiff argues that the ALJ committed multiple errors in symptom evaluation. However, viewed through the lens of the deferential standard of review which we must apply, this argument fails. As previously articulated, "[a]llegations of . . . subjective symptoms must be supported by objective medical evidence." <u>Hantraft</u> at 362. Further, the ALJ is obliged to consider certain factors in symptom evaluation, including activities of daily living; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating

51

factors; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his or her symptoms; treatment, other than medication that a claimant has received for relief; any measures the claimant has used to relieve his or her symptoms; and, any other factors concerning the claimant's functional limitations and restrictions. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

In this case, the ALJ complied with the regulations governing symptom evaluation, following the two-step process, and considering the factors set forth in the regulations. The ALJ did not rely on any single factor in finding the allegations concerning the intensity, persistence, and limited effects of the plaintiff's symptoms was not entirely consistent with the evidence in the record. Instead, the ALJ properly analyzed these subjective reports through the lens of  her treatment records and activities of daily living, all of which suggested that her impairments were moderate in severity, responded well to treatment, and did not prevent her from engaging in an array of activity, including prolonged employment.

Further, the simple tasks RFC fashioned by the ALJ met the evidentiary standards set by law, and that RFC was sufficiently articulated in the decision denying this claim. As we have noted, "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.'" Hess v. Comm'r

Soc. Sec., 931 F.3d at 211. In this regard, an ALJ offers a valid explanation for a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, . . . . " Hess v. Comm'r Soc. Sec., 931 F.3d 198, 214 (3d Cir. 2019). Here, the ALJ's decision correctly identified the plaintiff's moderate mental impairments in certain spheres of functioning, based upon medical and clinical evidence as well as De La Cruz's activities of daily living. Having made these findings, the ALJ then limited De La Cruz to "perform simple and routine tasks, to make simple work related decisions, to tolerate occasional changes in the work setting and to tolerate occasional interaction with the public and coworkers, but never to work at a production rate pace." (Tr. 860). This analysis which weds a simple tasks RFC to the medical evidence and claimant's activities of daily living is all that the law requires. There was no error on this score.

De La Cruz also argues that the hypothetical questions posed by the ALJ did not include all of De La Cruz's credibly established limitations. To be sure:

> "[A] hypothetical question posed to the vocational expert must reflect all of the claimant's impairments that are supported by the record; otherwise the question is deficient and the [vocational] expert's answer to it cannot be considered substantial evidence. Chrupcala, 829 F.2d at 1276; see also Rutherford, 399 F.3d at 554; Ramirez, 372 F.3d at 552-55; Podedworny, 745 F.2d at 218. The ALJ, however, is not required to

> submit to the vocational expert every impairment alleged by a claimant. Rutherford, 399 F.3d at 554. "[S]uch references to 'all impairments' encompass only those that are medically established." (Id.). Thus, the question posed to the ALJ must accurately convey to the vocational expert all of a claimant's credibly established limitations. Id. (quoting Plummer, 186 F.3d at 431).

Stancavage v. Saul, 469 F. Supp. 3d 311, 340 (M.D. Pa. 2020). In this case, however, the ALJ's hypothetical questions incorporated those limitations which the ALJ found to be proven by credible evidence and we have concluded that substantial evidence supported the ALJ's evaluation of these impairments. Therefore, the ALJ was not legally required to include additional impairments which were not fully supported by the evidence into the hypothetical questions posed to the vocational expert.

At bottom, it appears that the plaintiff is requesting that this court re-weigh the medical evidence and subjective testimony. This we may not do. See Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 359 (3d Cir. 2011) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) ("Courts are not permitted to re-weigh the evidence or impose their own factual determinations."); see also Gonzalez v. Astrue, 537 F.Supp.2d 644, 657 (D. Del. 2008) ("In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of the record.") (internal citations omitted)). Rather, our task is simply to determine whether the ALJ's decision is supported by substantial evidence, a quantum of proof

which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565. Finding that this deferential standard of review is met here, we conclude that a remand is not appropriate for the purpose of further assessing this evidence.

In any event, given the evidence—which shows that De La Cruz was actually working at a shift supervisor job which placed greater emotional demands upon her than the tasks identified by the ALJ in this decision—any error in this analysis was harmless. It is well established that Social Security appeals are subject to harmless error analysis. Therefore:

> [A]ny evaluation of an administrative agency disability determination must also take into account the fundamental principle that: "'No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.'" Moua v. Colvin, 541 Fed.Appx. 794, 798 (10th Cir. 2013) quoting Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989). Thus, ALJ determinations in Social Security appeals are subject to harmless error analysis, Seaman v. Soc. Sec. Admin., 321 Fed.Appx. 134, 135 (3d Cir. 2009) and "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." Shinseki v. Sanders, 556 U.S. 396, 409, 129 S. Ct. 1696, 1706, 173 L.Ed. 2d 532 (2009).

Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *4 (M.D. Pa. Mar.

29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No.

3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017). Simply put:

> In Social Security appeals courts may apply harmless error analysis
> when assessing the sufficiency of an ALJ's decision. Seaman v. Soc.
> Sec. Admin., 321 Fed.Appx. 134, 135 (3d Cir. 2009). "Under the
> harmless error rule, an error warrants remand if it prejudices a party's
> 'substantial rights.' An error implicates substantial rights if it likely
> affects the outcome of the proceeding, or likely affects the 'perceived
> fairness, integrity, or public reputation of judicial proceedings.'" Hyer
> v. Colvin, 72 F. Supp. 3d 479, 494 (D. Del. 2014).

Harrison v. Berryhill, No. 3:17-CV-618, 2018 WL 2051691, at *5 (M.D. Pa. Apr.

17, 2018), report and recommendation adopted, No. 3:17-CV-0618, 2018 WL

2049924 (M.D. Pa. May 2, 2018). In the instant case, given De La Cruz's prolonged

work history at a task which was more psychologically demanding than those jobs

chosen by the ALJ in this decision, it cannot be said that any alleged error likely

affected the outcome of the proceeding, or likely affected the perceived fairness,

integrity, or public reputation of the proceedings. Therefore, De La Cruz's

allegations of error are harmless on the unique facts of this case, where she

demonstrated an ability to work on a sustained basis.

In sum, on its merits the ALJ's assessment of the evidence in this case

complied with the dictates of the law and was supported by substantial evidence.

This is all that the law requires, and all that a claimant can demand in a disability

proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.' " Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case this decision will be affirmed.

## IV.    **Conclusion**

For the foregoing reasons, the decision of the Commissioner in this case will be affirmed, and the plaintiff's appeal denied.

An appropriate order follows.

*/S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: January 21, 2025